**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARIA VASSALOTTI a/k/a | : | |
| MARIE MCBRIDE, | : | |
|     Plaintiff | : | CIVIL ACTION |
| | : | |
|         v. | : | NO. 08-5574 |
| | : | |
| WELLS FARGO BANK, N.A. d/b/a | : | |
|   AMERICA'S SERVICING COMPANY, | | |
|     Defendant | | |

September _22,_ 2011                                                       Anita B. Brody, J.

**MEMORANDUM**

**I. INTRODUCTION**

Plaintiff Marie Vassalotti[1] brings this action against Defendant Wells Fargo Bank, N.A. d/b/a America's Servicing Company ("Wells Fargo"), claiming that Wells Fargo failed to service her mortgage loan in accordance with the terms of the original note and mortgage, two loan modification agreements, and state and federal law.

Wells Fargo moves for summary judgment on the three remaining claims in Vassalotti's Third Amended Complaint ("3AC"):[2] breach of contract (Count II), violation of the Fair Credit

---

[1] On October 1, 2009, Vassalotti's counsel moved to withdraw his representation. On October 29, 2009, I granted his motion (ECF No. 33). Since then, Vassalotti has proceeded *pro se*.

[2] On October 21, 2009, I granted Defendant's Motion to Dismiss (ECF No. 14) Count III of the Second Amended Complaint, which alleged a violation of Pennsylvania's Loan Interest and Protection Law. On August 10, 2010, I granted Defendant's Motion to Dismiss (ECF No. 40) Count I of the Third Amended Complaint, which alleged a violation of the Real Estate Settlement Procedures Act.

Reporting Act ("FCRA") (Count IV), and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count V).[3]

Vassalotti seeks the following forms of relief against Wells Fargo: declaratory judgment and damages for breach of contract; civil damages under the FCRA; actual, treble, and punitive damages for violation of the FCRA; and reasonable attorney's fees, litigation expenses, and costs of suit.

## II. BACKGROUND

In August 2007, Wells Fargo, as servicer of Vassalotti's mortgage loan, filed a foreclosure action against Vassalotti because she failed to make the required payments under her mortgage agreement.[4] Pl.'s Resp. 1. On November 14, 2007, Wells Fargo sent Vassalotti a letter describing four potential solutions for distressed borrowers, including its loan modification program.[5] Pl.'s Resp., Ex. D. Loan modification programs generally assist delinquent borrowers by extending their overdue payment obligations over the remaining term of the loan. Typically, the borrower's deficit ("capitalized amount") is added to the original loan's remaining balance, to create an increased overall balance. The borrower then agrees to make payments toward the modified balance and has no further obligations with respect to the original shortfall. The "capitalized amount" may include delinquent interest, taxes and/or insurance payments. The latter two are generally grouped together under "escrow." An escrow account is an "account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums

---

[3] Federal question jurisdiction over Count IV is proper pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Counts II and V is proper under 28 U.S.C. § 1367(a). Neither side disputes the application of Pennsylvania law to the Count II breach of contract claim.

[4] At the time of the initial mortgage agreement, Vassalotti was using the last name McBride. Wells Fargo continued to refer to her as Ms. McBride in future correspondence.

[5] In addition to "Loan Modification," the letter lists three other potential solutions for distressed borrowers: "Repayment Plan;" "Short Sale;" and "Deed in Lieu of Foreclosure."

(including flood insurance), or other charges with respect to a federally related mortgage loan."
24 C.F.R. § 3500.17.

In the November 14, 2007 letter, Wells Fargo described its own loan modification program as follows: "This program adds the delinquent interest, taxes, and/or insurance payments to your unpaid balance if applicable. If you qualify, we may be able to extend the repayment of the past due amounts over the remaining term of your loan." Pl.'s Resp., Ex. D. Over the next six months, Vassalotti and Wells Fargo executed two loan modifications ("LM1" and "LM2"). This action arises in part out of a dispute over whether LM1 and LM2 cured the deficit in Vassalotti's escrow account by including it in the total deficit amount that was capitalized – and regardless, whether the loan modification agreements were themselves deceptive.

On December 14, 2007, Wells Fargo sent Vassalotti LM1. Pl.'s Resp., Ex. B. LM1 included a cover letter stating:

> This letter will confirm the formal approval of a loan modification/restructure of your mortgage loan. . . . Please sign the enclosed loan modification agreement and return it, along with any payment(s) and/or contribution due as reflected in the terms of this letter. . . . The terms of your modification/restructure are outlined below:
> 1. Due date of first payment: 03/01/2008
> 2. New principal and interest payment amount: $2,624.88
> 3. Required escrow payment based on previous analysis: $322.03
> 4. Estimated new net payment: $2,946.91
> 5. Modified Maturity Date: 12/01/2035
> 6. Interest rate: 9.650% . . .
> This proposal is valid for five (5) days from the date of this letter. . . .

Pl.'s Resp., Ex. B. A five-page agreement followed the two-page cover letter. The monetary figures listed in the agreement make no reference to a required escrow payment of $322.03. The only reference to "escrow" appears in the fourth paragraph of page 2, which states:

> Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, *escrow items*, impounds, and all other payments that Borrower is obligated to make under the Security instrument . . . .

Pl.'s Resp., Ex. B (emphasis added). Vassalotti accepted and signed LM1, and Wells Fargo cancelled the pending Sheriff's sale of her home that was scheduled for January 18, 2008. Pl.'s Resp. 1. She paid the mutually agreed upon contribution of $5,120.35[6] listed in the first paragraph of the cover letter and made the first two months of payments. Pl.'s Resp., Ex. B.

On January 16, 2008, Vassalotti filed for bankruptcy. Vassalotti's primary purpose for filing for bankruptcy was to discharge credit card debt. Vassalotti Dep. 54:23-24. On February 12, 2008, Wells Fargo "inadvertently placed [LM1] on hold due to the bankruptcy status of the loan." Pl.'s Resp., Ex. E. This meant that in spite of accepting Vassalotti's payments, Wells Fargo did not apply them towards her account and instead considered her to be delinquent.[7] On April 18, 2008, Vassalotti was granted a discharge in bankruptcy under section 727 of Title 11 of the United States Code. Def.'s Mot. Summ. J., Ex. I.

On May 10, 2008, Wells Fargo offered Vassalotti LM2, which she signed and accepted. Pl.'s Resp., Ex. C. As was the case with LM1, LM2 also included a cover letter stating:[8]

> This letter will confirm the formal approval of a loan modification/restructure of your mortgage loan. . . . Please sign the enclosed loan modification agreement and return it, along with any payment(s) and/or contribution due as reflected in the terms of this letter. . . . The terms of your modification/restructure are outlined below:
> 1. Due date of first payment: 07/01/2008

---

[6] The initial contribution of $5,120.35 is not mentioned again in the loan agreement, and the cover letter does not provide any explanation for how the figure was calculated. The cover letter's first paragraph states: "To facilitate this transaction, it was mutually agreed that a contribution of $5,120.35 would be required, which will be applied toward the accrued delinquency." Pl.'s Resp., Ex. B.

[7] Wells Fargo, however, did not inform Vassalotti that it had inadvertently put LM1 on hold until November 12, 2008. Pl.'s Resp., Ex. E.

[8] LM2's cover letter also included in the first paragraph a "mutually agreed" upon contribution that was not explained or later mentioned in the agreement. The required contribution was $9,990.91. Pl.'s Resp., Ex. C.

    2. New principal and interest payment amount: $2,691.86
    3. Required escrow payment based on previous analysis: $327.45
    4. Estimated new net payment: $3,019.31
    5. Modified Maturity Date: 12/01/2035
    6. Interest rate: 9.650% . . .
This proposal is valid for five (5) days from the date of this letter.

Pl.'s Resp., Ex. C.

As was the case with LM1, LM2 included a five-page agreement that followed the two-page cover letter. The monetary figures listed in the agreement make no reference to a required escrow payment of $327.45. The first reference to "escrow" appears in Section D of Paragraph 2 on the first page of LM2.[9] The Section states:

> The borrower promises to pay the unpaid principal balance plus interest, to the order of the Lender. Interest will be charged on the unpaid principal balance of U.S. $310,926.76. The borrower promises to make monthly payments of principal and interest of U.S. $2,691.86, at a yearly rate of 9.650%, *not including any escrow deficit, if applicable* . . . .

Pl.'s Resp., Ex. C (emphasis added). The second reference to "escrow" appears in the fourth paragraph of page 2, which states:

> Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, *escrow items*, impounds, and all other payments that Borrower is obligated to make under the Security instrument . . . .[10]

Pl.'s Resp., Ex. C (emphasis added).

Unlike LM1, LM2 also includes a "Loan Modification Transmittal Form" that follows the five-page agreement. Pl.'s Resp., Ex. C. The "Transmittal Form" includes "Part C: Modification Data," which includes a subsection, entitled "Breakdown of Amounts Due." This subsection lists figures that add up to the total deficit (also referred to as the "capitalized amount") that was

---

[9] There is not a comparable page in LM1.
[10] This is the same language that appears in LM1.

added to the overall balance due. The column lists ".00" for "Escrow." Vassalotti argues that the entry of ".00" with respect to the escrow balance demonstrates that the loan modification brought her escrow account deficit to zero. In contrast, Wells Fargo contends that the "Breakdown of Amounts Due" subsection lists only the amounts that were capitalized into the modified balance. It argues that the ".00" entry for the escrow line item reflects that Vassalotti's escrow obligations were not capitalized into the modified balance.

On June 27, 2008, Vassalotti mailed in the first LM2 monthly payment of $3,019.31, as listed on LM2's cover letter. The payment included $327.45 in escrow. In July, Wells Fargo informed Vassalotti that her escrow account maintained a deficit of $10,220.35 and that it was increasing her monthly escrow payments to $1,214.35, thereby raising her total monthly payments by $886.55. Pl.'s Resp., Ex. H. On August 10, 2008, Wells Fargo wrote Vassalotti informing her that she was delinquent on the required payments under the mortgage agreement. Pl.'s Resp., Ex. G.

On August 19, 2008, Vassalotti wrote Wells Fargo disputing her mortgage loan's accounting.[11] Pl.'s Second Am. Compl., Ex. T. The letter expressed Vassalotti's belief that Wells Fargo erred by carrying over a negative escrow balance from her original mortgage agreement and increasing her required escrow payments. On October 5, 2008, Wells Fargo sent Vassalotti an Act 91 foreclosure notice. Pl.'s Resp., Ex I.

Despite already issuing the October foreclosure notice, Wells Fargo responded to Vassalotti's August letter on November 12, 2008, explaining that the loan modification agreements failed to cure Vassalotti's escrow deficit. Def.'s Mot. to Dismiss, Ex. 1. Seven months after

---

[11] Vassalotti also claims that she spoke with Wells Fargo over the phone on multiple occasions in August and September 2008 to reiterate her dispute of the mortgage loan's accounting. Pl.'s Second Am. Compl. 6.

inadvertently placing LM1 on hold, Wells Fargo admitted for the first time in its November 12, 2008 letter admitted that it had made the mistake back in February 2008 and that it was waiving the relevant late fees and applying Vassaslotti's initial payments under LM1. Yet Wells Fargo maintained that the escrow balance had not been capitalized. Thus even after applying the initial LM1 payments and waiving the late fees, Vassalotti's monthly bill was only reduced to $3,424.00 – which was still higher than the monthly bill of $3,019.31 that was listed on LM2's Cover Letter.

### III. LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir. 1997). There is a "genuine" issue of material fact if the evidence would permit a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." Id.

The moving party must make an initial showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Fed. R. Civ. P. 56(c)(1). In determining whether the non-moving party has established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The threshold inquiry at the summary judgment stage involves determining whether there is

the need for trial, that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**IV. DISCUSSION**

**A. Breach of Contract**

Vassalotti contends that Wells Fargo breached LM1.[12] In order to maintain such a claim, Vassalotti must show: "there was a contract, the defendant breached it, and plaintiffs suffered damages from the breach." McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010) (citing Hart v. Arnold, 884 A.2d 316, 332 (Pa. Super. Ct. 2005)). "It is a familiar rule of contract law, adopted and applied by the courts of Pennsylvania, that a party breaches a bilateral contract when he does improperly or fails to do something which he has expressly or impliedly undertaken to do to facilitate the performance of the other party." Johnson v. Fenestra, Inc. (Erection Div.), 305 F. 2d 179, 181 (3d Cir. 1962) (citations omitted).

Wells Fargo sent LM1 to Vassalotti on December 14, 2007, and Vassalotti signed and returned it to Wells Fargo on January 10, 2008. Def.'s Mot. Summ. J. 3. On February 12, 2008, Wells Fargo inadvertently placed LM1 "on hold." Pl.'s Resp., Ex. E. As a result of the "hold," Wells Fargo failed to apply Vassalotti's initial payments to her balance and deemed her to be

---

[12] Vassalotti incorporated her Second Amended Complaint ("2AC") Breach of Contract Claim by reference into her Third Amended Complaint ("3AC"). 3AC ¶1. In 2AC, Vassalotti also includes two sentences on Wells Fargo's alleged breach of an implied covenant of good faith and fair dealing. 2AC ¶¶ 47-48. Vassalotti does not clarify if she is bringing a separate claim on this basis or including the allegation as part of her overall breach of contract claim. The distinction, however, is immaterial since Pennsylvania "courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000); see, e.g., Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co., 560 A.2d 151, 153-54 (Pa. Super. Ct. 1989) (restricting the duty to narrow situations, such as insurers' interactions with insureds and franchisors' interactions with franchisees). This is not one of those limited circumstances, especially since the underlying facts are the same for each claim. Therefore, Vassalotti's breach of covenant of good faith and fair dealing claim is "subsumed in [her] breach of contract claim[] and cannot be maintained as a separate cause of action." Sentry Pain Technologies, Inc. v. Topth, Inc., No. 08-1064, 2008 WL 4787579, at *12 (E.D. Pa. Oct. 31, 2008) (citation omitted).

delinquent. On May 10, 2008, without informing her of the hold, Wells Fargo offered Vassalotti LM2, which the two parties executed on May 22, 2008. Def.'s Mot. Summ. J. 3. Although Wells Fargo attempted to remedy the situation by waiving late fees in the amount of $450.39 and removing Corporate Advance fees in the amount of $2,166.40, it did so six months after executing LM2. Pl.'s Resp., Ex. E.

Wells Fargo does not dispute the error but rather counters that Vassalotti can only raise a breach of contract claim on LM2 since it supersedes LM1 and Vassalotti omitted a breach of contract claim against LM2. Def.'s Mot. Summ. J. 6.[13] Wells Fargo, however, fails to cite to any case law in support of its argument and instead offers a groundless estoppel argument that overlooks a crucial fact. Def.'s Mot. Summ. J. 6. Wells Fargo ignores its failure to inform Vassalotti prior to the execution of LM2 that it had "inadvertently" placed LM1 "on hold" and does not consider the extent to which that omission may have influenced Vassalotti's decision to enter into LM2 in the first place.

As a result of the above shortcomings, I am denying Defendant's Motion for Summary Judgment on Vassalotti's Breach of Contract claim, without prejudice to present more authority on the same issues at a later stage in the proceedings.

**B. Fair Credit Reporting Act ("FCRA")**

Vassalotti contends that Wells Fargo violated the FCRA when it provided the Credit Rating Agencies (collectively, "CRAs") Experian, Equifax, and TransUnion with inaccurate information regarding the status of her mortgage loan. Wells Fargo counters that Vassalotti cannot prevail because the disputed information was accurate. See Def.'s Mot. Summ. J. 8.

"Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote

---

[13] Vassalotti admits to omitting inadvertently a LM2 breach of contract claim. Pl.'s Resp. 6.

efficiency in the banking system, and protect consumer privacy." Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 191 (3d Cir. 2009) (citation omitted).  To make out a claim under 15 U.S.C. § 1681s-2b of the FCRA, Vassalotti must prove: "(1) that [s]he notified a credit reporting agency of the dispute under § 1681i, (2) that the credit reporting agency notified the party who furnished the information under § 1681i(a)(2), and (3) that the party who furnished the information failed to investigate or rectify the disputed charge []." Taggart v. Norwest Mortg., Inc., No. 09-1281, 2010 WL 114946, at *27 (E.D. Pa. Jan. 11, 2010).

Vassalotti notified the CRAs to dispute the designation of her mortgage loan as discharged through bankruptcy.  Pl.'s Resp., Ex. K.  Vassalotti also shows via the credit reports that the CRAs contacted Wells Fargo, the provider of the information regarding the mortgage.  Pl.'s Resp., Ex. K.  Yet Vassalotti does not show that Wells Fargo "failed to investigate or rectify the disputed charge." Taggart, 2010 WL 114946, at *27.  Vassalotti argues that the continued presence of the bankruptcy discharge notation on her credit reports proves that Wells Fargo failed to investigate or refused to correct the mistake.  Yet the notation on the credit reports does not prove that Wells Fargo failed to investigate the matter, and Wells Fargo can only correct *inaccurate* information.

There is no reason to believe that the information is inaccurate.  Vassalotti admitted to receiving a bankruptcy discharge on April 18, 2008, and the three credit reports she submitted as a joint exhibit accurately state that fact.  Def.'s Mot. Summ. J., Ex. L; Pl.'s Resp., Ex. K.  Vassalotti may not recognize the distinction between the discharge of her personal liability and Wells Fargo's retention of a valid lien on the property itself.[14]  See, e.g., Dewsnup v. Timm, 502

---

[14] The Discharge of Debtor order signed by U.S. Bankruptcy Judge Stephen Raslvich provides an "Explanation of Bankruptcy Discharge in a Chapter 7 Case."  The Explanation states: "The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. . . . However, a creditor may have the right to enforce a valid lien,

10

U.S. 410, 418 (1992). The Experian Report, for example, specifically lists that the "Responsibility" of the discharged mortgage is "Individual." Pl.'s Resp., Ex. K.

Due to Vassalotti's failure to show that there is a genuine issue as to the accuracy of the charges, I grant Defendant's Motion for Summary Judgment on Vassalotti's FCRA claim.

**C. Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL")**

Vassalotti brings a claim against Wells Fargo under the "catch-all" provision of the UTPCPL that prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi). "To bring a private cause of action under the [Consumer Protection Law], a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." Hunt v. United States Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (citing Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004)). Thus, a plaintiff alleging deceptive conduct must satisfy three elements:

> First, a plaintiff must allege facts showing a deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under similar circumstances. Next, the plaintiff must allege justifiable reliance, in other words that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the defendants' misrepresentation or deceptive conduct. Finally, the plaintiff must allege that this justifiable reliance caused ascertainable loss.

Seldon v. Home Loan Serv., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009). Pennsylvania's "UTPCPL is to be liberally construed to effectuate the legislature's goal of consumer protection." Keller v. Volkswagen of America, Inc., 733 A.2d 642, 646 (Pa. Super. Ct. 1999).

Vassalotti points to three different groups of documents to support her argument:

---

such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case." Def. Mot. to Dismiss, Ex. 3. Vassalotti has not provided any evidence indicating that the lien was "avoided or eliminated." Id.

- Wells Fargo's 11/14/07 "Borrower Counseling Program" Letter (Pl.'s Resp., Ex. D)

    - Wells Fargo issues this standard-form letter to distressed borrowers who fall behind on their loan payments. Wells Fargo first sent Vassalotti a copy of this letter on August 21, 2007 after she started missing payments. Pl.'s Resp., Ex. A.

- LM1 and Cover Letter (Pl.'s Resp., Ex. B)

- LM2 and Cover Letter (Pl.'s Resp, Ex. C)

The 11/14/07 "Borrower Counseling Program" letter, sent to Vassalotti after she continued to miss payments, outlines four possible alternatives to foreclosure: "Repayment Plan;" "Loan Modification;" "Short Sale;" and "Deed in Lieu of Foreclosure." At the bottom of the letter, Wells Fargo invites distressed borrowers to apply to its borrower counseling program but does not indicate which of the four options, if any, an applicant will receive. Pl.'s Resp., Ex. D. The second section of the letter describing the "Loan Modification" states: "This program adds the delinquent interest, taxes, *and/or* insurance payments to your unpaid balance *if* applicable. *If* you qualify, we *may* be able to extend the repayment of the past due amounts over the remaining term of your loan." Pl.'s Resp., Ex. D (emphasis added).  Neither side has explained how the two parties decided that Vassalotti would receive the second option, a "Loan Modification." Yet once she received the loan modification paperwork in December, she presumed that her *misreading* of the 11/14/07 letter was controlling and that her loan modification would provide for her delinquent taxes and insurance payments (i.e., her escrow deficit) to be added to her overall unpaid loan balance. The non-binding and permissive language, however, is sufficiently clear so as not to "deceive a consumer acting reasonably under similar circumstances." Seldon, 647 F. Supp. 2d at 470. Because of the letter's clarity, the first element of deception has not been met, and therefore I do not need to address the second and third elements of justifiable reliance

and ascertainable loss.  Nonetheless, Vassalotti would not have been justified relying on a general distressed borrower letter that listed four different options, only one of which was "Loan Modification."

LM1, LM2, and their respective cover letters are not as clear.  Wells Fargo addressed the cover letters to Vassalotti and mailed them to her as part of the loan modification document packages.  Wells Fargo maintains that the cover letters are "transmittal letters" that are not part of the loan modification agreements.  Def.'s Mot. Summ. J. 13, 14.  Yet the term "transmittal" does not appear on either of them.  In fact, the header on the second page of LM2's alleged "transmittal letter" reads: "Loan Modification Agreement Page 2 of 2," and includes a signature line that Vasaslotti signed.

Moreover, Wells Fargo admits that LM1's "transmittal letter" contains specific LM1 terms, "including the due date of [Plaintiff's] first payment, the new principal and interest payment amount, the modified maturity date and the reduced interest."  Wells Fargo also admits that LM2's "transmittal letter" provides a summary of certain provisions included in LM2 but then adds that the transmittal letter includes "information that does not appear in LM2."  Def.'s Mot. Summ. J. 15.  Both "transmittal letters" inexplicably include specific escrow payment contributions that Vassalotti was somehow supposed to know did not represent a capitalization of her escrow deficit.[15]  Therefore, a jury could find that these befuddling cover letters, in conjunction with the loan modification agreements, constitute "conduct that is likely to deceive a consumer acting reasonably under similar circumstances."  Seldon, 647 F. Supp. 2d at 470.

As for the second element of justifiable reliance, Wells Fargo admits that Vassalotti *relied*

---

[15] Wells Fargo offers no explanation for why it included the confusing term "Required escrow payment based on previous analysis" on the Cover Letters.

upon the "transmittal letters" to identify the terms of her loan modification agreements. Def.'s Mot. Summ. J. 13-14. But Wells Fargo argues that Vassalotti was unjustified in relying on the "transmittal letters" to execute the agreements. However, the letters' lack of clarity--particularly the listing of specific figures on LM1 and the "Loan Modification Agreement" header and signature line on LM2--provide sufficient grounds for presenting the question to a jury.

As for the third element of ascertainable loss, Wells Fargo does not address the matter at all. The mortgage servicer thus takes no issue with Vassalotti's argument that she suffered losses stemming from the initiation of the foreclosure process in October 2008 and from the higher escrow payments in dispute. I therefore deny Defendant's Motion for Summary Judgment under Vassalotti's UTPCPL claim.

## V. Conclusion

For the foregoing reasons, I will grant Defendant's Motion for Summary Judgment on Count IV (FCRA), and I will deny Defendant's Motion for Summary Judgment on Count V (UTPCPL). I will also deny Defendant's Motion for Summary Judgement on Count II (Breach of Contract), without prejudice to present more authority on the same issues at a later stage in the proceedings.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:              Copies **MAILED** on _____ to: